Adam D. Smith, Esq.
Nevada Bar No. 9690
Hector J. Carbajal II, Esq.
Nevada Bar No. 6247
SMITH CARBAJAL
2340 Paseo Del Prado, Suite D203
Las Vegas, Nevada  89102
T: (702) 929-2289
F: (702) 960-4454
adam@scvegas.com
hector@scvegas.com
*Attorneys for Defendant*
*CrossCountry Mortgage, Inc.*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| FREEDOM MORTGAGE CORPORATION, | Case No.:  2:18-CV-00270-APG-CWH |
| Plaintiff, | |
| v. | **ANSWER AND COUNTERCLAIM OF DEFENDANT CROSSCOUNTRY MORTGAGE, INC.** |
| CROSSCOUNTRY MORTGAGE, INC., | |
| Defendant. | |

Defendant CrossCountry Mortgage, Inc. ("CrossCountry"), by its undersigned attorneys, for its Answer to the Complaint (the "Complaint") of Plaintiff Freedom Mortgage Corporation ("Freedom Mortgage"), hereby states as follows:

The allegations in the unnumbered paragraph at the beginning of the Complaint are characterizations of the Complaint to which no response is required.  To the extent a response is required, CrossCountry denies the allegations of the unnumbered paragraph at the beginning of the Complaint.

Further, CrossCountry omits, and provides no response to, the headings used by Freedom Mortgage, as those headings are not part of the body of the Complaint.  To the extent any response to the Complaint's headings is necessary, CrossCountry denies any and all allegations contained in



1

any heading.[1]

1.      CrossCountry admits the allegations of Paragraph 1 of the Complaint.

2.      CrossCountry admits that it is an Ohio for-profit corporation headquartered at 6850 Miller Road, Brecksville, Ohio 44141, and that it conducts business in the State of Nevada. CrossCountry is without knowledge or information sufficient to form a belief as to the remaining allegations of Paragraph 2 of the Complaint.

3.      The allegations in Paragraph 3 of the Complaint constitute a conclusion of law regarding jurisdiction, to which no response is required.

4.      The allegations in Paragraph 4 of the Complaint constitute a conclusion of law regarding jurisdiction, to which no response is required.

5.      The allegations in Paragraph 5 of the Complaint constitute a conclusion of law regarding jurisdiction, to which no response is required.

6.      The allegations in Paragraph 6 of the Complaint constitute a conclusion of law regarding jurisdiction, to which no response is required.

7.      The allegations in Paragraph 7 of the Complaint constitute a conclusion of law regarding venue, to which no response is required.

8.      The allegations in Paragraph 8 of the Complaint are characterizations of the Complaint to which no response is required.  To the extent a response is required, CrossCountry denies the allegations in Paragraph 8 of the Complaint.

9.      The allegations in Paragraph 9 of the Complaint are characterizations of the Complaint to which no response is required.  To the extent a response is required, CrossCountry denies the allegations in Paragraph 9 of the Complaint.

10.      CrossCountry admits that Freedom Mortgage is a mortgage company.  CrossCountry

---

[1] In response to footnote 1 of the Complaint, CrossCountry admits that Freedom Mortgage filed an action in the United States District Court for the District of New Jersey, Docket No. 1:17-cv-11528-RBK-KMW.  CrossCountry further admits that on January 12, 2018, it moved to dismiss the complaint filed there because, among other things, that Court plainly did not possess personal jurisdiction over CrossCountry.  CrossCountry admits and avers that, rather than defend a frivolous contention that CrossCountry was subject to personal jurisdiction in New Jersey, Freedom Mortgage dismissed that action pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i), and filed the instant action in this Court.  CrossCountry denies the remaining allegations of footnote 1 of the Complaint.

is without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 10 of the Complaint, and on that basis, denies those allegations.

11.     CrossCountry is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 11 of the Complaint, and on that basis, denies those allegations.

12.     CrossCountry is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 12 of the Complaint, and on that basis, denies those allegations.

13.     CrossCountry admits that it is a mortgage company and a competitor with Freedom Mortgage nationally.  CrossCountry is without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 13 of the Complaint, and on that basis, denies those allegations.

14.     CrossCountry admits the allegations in Paragraph 14 of the Complaint.

15.     CrossCountry admits and averts that it operates a branch at the office complex at 6256 Spring Mountain Road, Las Vegas.  CrossCountry admits that Freedom Mortgage formerly operated a branch at the office complex at the same address.  CrossCountry denies the remaining allegations in Paragraph 15 of the Complaint.

16.     CrossCountry denies the allegations in Paragraph 16 of the Complaint.

17.     CrossCountry denies the allegations in Paragraph 17 of the Complaint.

18.     CrossCountry denies the allegations in Paragraph 18 of the Complaint.

19.     CrossCountry denies the allegations in Paragraph 19 of the Complaint.

20.     CrossCountry denies the allegations in Paragraph 20 of the Complaint.

21.     CrossCountry denies the allegations in Paragraph 21 of the Complaint.

22.     CrossCountry denies the allegations in Paragraph 22 of the Complaint.

23.     CrossCountry denies the allegations in Paragraph 23 of the Complaint.

24.     The allegations in Paragraph 24 of the Complaint are characterizations of the Complaint to which no response is required.  To the extent a response is required, CrossCountry denies the allegations in Paragraph 24 of the Complaint.

25.     CrossCountry is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 25 of the Complaint, and on that basis, denies those allegations.



26.     CrossCountry is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 26 of the Complaint, and on that basis, denies those allegations.

27.     CrossCountry is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 27 of the Complaint, and on that basis, denies those allegations.

28.     CrossCountry denies that Freedom Mortgage attached an Exhibit A to the Complaint. CrossCountry is without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 28 of the Complaint, and on that basis, denies those allegations.

29.     The allegations in Paragraph 29 of the Complaint purport to quote from an Employment Agreement between Ed Kamibayashiyama (also known as Ed Kami) and Freedom Mortgage; the provisions of that agreement speak for themselves and CrossCountry refers to them for a complete and accurate portrayal of their contents.

30.     The allegations in Paragraph 30 of the Complaint purport to quote from an Employment Agreement between Mr. Kami and Freedom Mortgage; the provisions of that agreement speak for themselves and CrossCountry refers to them for a complete and accurate portrayal of their contents.

31.     The allegations in Paragraph 31 of the Complaint purport to characterize or paraphrase a provision of an Employment Agreement between Mr. Kami and Freedom Mortgage; the provisions of that agreement speak for themselves and CrossCountry refers to them for a complete and accurate portrayal of their contents.  CrossCountry is without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 31 of the Complaint, and on that basis, denies those allegations.

32.     The allegations in Paragraph 32 of the Complaint purport to characterize or paraphrase a provision of an Employment Agreement between Mr. Kami and Freedom Mortgage; the provisions of that agreement speak for themselves and CrossCountry refers to them for a complete and accurate portrayal of their contents.  CrossCountry is without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 32 of the Complaint, and on that basis, denies those allegations.

33.     CrossCountry is without knowledge or information sufficient to form a belief as to the



1    allegations in Paragraph 33 of the Complaint, and on that basis, denies those allegations.

2        34.    CrossCountry is without knowledge or information sufficient to form a belief as to the

3    allegations in Paragraph 34 of the Complaint, and on that basis, denies those allegations.

4        35.    CrossCountry admits and avers that it hired Mr. Kami as a vice president on or about

5    February 27, 2017.  CrossCountry further avers that Mr. Kami is no longer employed at CrossCountry.

6    CrossCountry denies the remaining allegations in Paragraph 35 of the Complaint.

7        36.    CrossCountry is without knowledge or information sufficient to form a belief as to the

8    allegations in Paragraph 36 of the Complaint, and on that basis, denies those allegations.

9        37.    CrossCountry is without knowledge or information sufficient to form a belief as to the

10   allegations in Paragraph 37 of the Complaint, and on that basis, denies those allegations.

11       38.    CrossCountry is without knowledge or information sufficient to form a belief as to the

12   allegations in Paragraph 38 of the Complaint, and on that basis, denies those allegations.

13       39.    CrossCountry is without knowledge or information sufficient to form a belief as to the

14   allegations in Paragraph 39 of the Complaint, and on that basis, denies those allegations.

15       40.   CrossCountry denies that Freedom Mortgage attached an Exhibit B to the Complaint.

16   CrossCountry is without knowledge or information sufficient to form a belief as to the remaining

17   allegations in Paragraph 40 of the Complaint, and on that basis, denies those allegations.

18       41.    The allegations in Paragraph 41 of the Complaint purport to quote from an

19   Employment Agreement between Christina Singleton and Freedom Mortgage; the provisions of that

20   agreement speak for themselves and CrossCountry refers to them for a complete and accurate

21   portrayal of their contents.

22       42.    The allegations in Paragraph 42 of the Complaint purport to quote from an

23   Employment Agreement between Ms. Singleton and Freedom Mortgage; the provisions of that

24   agreement speak for themselves and CrossCountry refers to them for a complete and accurate

25   portrayal of their contents.

26       43.    The allegations in Paragraph 43 of the Complaint purport to quote from an

27   Employment Agreement between Ms. Singleton and Freedom Mortgage; the provisions of that

28   agreement speak for themselves and CrossCountry refers to them for a complete and accurate



portrayal of their contents..

44.     CrossCountry is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 44 of the Complaint, and on that basis, denies those allegations.

45.     CrossCountry is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 45 of the Complaint, and on that basis, denies those allegations.

46.     CrossCountry admits that it hired Ms. Singleton as a manager on or about February 27, 2017.   CrossCountry further avers that Ms. Singleton is no longer employed at CrossCountry. CrossCountry denies the remaining allegations in Paragraph 46 of the Complaint.

47.     CrossCountry is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 47 of the Complaint, and on that basis, denies those allegations.

48.     CrossCountry is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 48 of the Complaint, and on that basis, denies those allegations.

49.     CrossCountry is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 49 of the Complaint, and on that basis, denies those allegations.

50.     CrossCountry is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 50 of the Complaint, and on that basis, denies those allegations.

51.     CrossCountry is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 51 of the Complaint, and on that basis, denies those allegations.

52.     CrossCountry is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 52 of the Complaint, and on that basis, denies those allegations.

53.     CrossCountry is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 53 of the Complaint, and on that basis, denies those allegations.

54.     CrossCountry is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 54 of the Complaint, and on that basis, denies those allegations.

55.     CrossCountry denies the allegations in Paragraph 55 of the Complaint.

56.     CrossCountry denies the allegations in Paragraph 56 of the Complaint.

57.     CrossCountry is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 57 of the Complaint, and on that basis, denies those allegations.

1    58.    CrossCountry denies the allegations in Paragraph 58 of the Complaint.

2    59.    CrossCountry denies the allegation in Paragraph 59 of the Complaint that any alleged

3  conduct by Mr. Kami was "on behalf of CrossCountry."  CrossCountry is without knowledge or

4  information sufficient to form a belief as to the remaining allegations in Paragraph 59 of the

5  Complaint, and on that basis, denies those allegations.

6    60.    CrossCountry is without knowledge or information sufficient to form a belief as to the

7  allegations in Paragraph 60 of the Complaint, and on that basis, denies those allegations.

8    61.    CrossCountry is without knowledge or information sufficient to form a belief as to the

9  allegations in Paragraph 61 of the Complaint, and on that basis, denies those allegations.

10   62.    CrossCountry denies the allegation in Paragraph 62 of the Complaint that any alleged

11  conduct by Mr. Kami and/or Ms. Singleton was "on behalf of CrossCountry."  CrossCountry is

12  without knowledge or information sufficient to form a belief as to the remaining allegations in

13  Paragraph 62 of the Complaint, and on that basis, denies those allegations.

14   63.    CrossCountry denies the allegation in Paragraph 63 of the Complaint that any alleged

15  conduct by Mr. Kami and/or Ms. Singleton was "on behalf of CrossCountry."  CrossCountry is

16  without knowledge or information sufficient to form a belief as to the remaining allegations in

17  Paragraph 63 of the Complaint, and on that basis, denies those allegations.

18   64.    CrossCountry denies the allegations in Paragraph 64 of the Complaint.

19   65.    CrossCountry denies the allegations in Paragraph 65 of the Complaint.

20   66.    CrossCountry denies the allegations in Paragraph 66 of the Complaint.

21   67.    CrossCountry denies the allegations in Paragraph 67 of the Complaint.

22   68.    CrossCountry denies the allegations in Paragraph 68 of the Complaint.

23   69.    CrossCountry denies the allegation in Paragraph 69 of the Complaint that any alleged

24  conduct by "then-Freedom employees" was "at the direction, encouragement, and/or on behalf of

25  CrossCountry."  CrossCountry is without knowledge or information sufficient to form a belief as to

26  the remaining allegations in Paragraph 69 of the Complaint, and on that basis, denies those allegations.

27   70.    CrossCountry denies the allegations in Paragraph 70 of the Complaint.

28   71.    CrossCountry is without knowledge or information sufficient to form a belief as to the

1   allegations in Paragraph 71 of the Complaint, and on that basis, denies those allegations.

2         72.    CrossCountry denies the allegation in Paragraph 72 of the Complaint that any alleged

3   conduct by Jia Mei Wang was "on CrossCountry's behalf."  CrossCountry is without knowledge or

4   information sufficient to form a belief as to the remaining allegations in Paragraph 72 of the

5   Complaint, and on that basis, denies those allegations.

6         73.    CrossCountry denies the allegation in Paragraph 73 of the Complaint that any alleged

7   conduct by Ms. Wang was "on CrossCountry's behalf and/or with CrossCountry's knowledge."

8   CrossCountry is without knowledge or information sufficient to form a belief as to the remaining

9   allegations in Paragraph 73 of the Complaint, and on that basis, denies those allegations.

10         74.    CrossCountry denies the allegations in Paragraph 74 of the Complaint.

11         75.    CrossCountry denies the allegations in Paragraph 75 of the Complaint.

12         76.    CrossCountry denies the allegations in Paragraph 76 of the Complaint.

13         77.    CrossCountry denies the allegations in Paragraph 77 of the Complaint.

14         78.    CrossCountry denies the allegations in Paragraph 78 of the Complaint.

15         79.    CrossCountry is without knowledge or information sufficient to form a belief as to the

16   allegations in Paragraph 79 of the Complaint, and on that basis, denies those allegations.

17         80.    CrossCountry denies the allegation in Paragraph 80 of the Complaint that "the

18   'CrossCountry' network was created using [Freedom Mortgage's] computers and computer systems."

19   CrossCountry is without knowledge or information sufficient to form a belief as to the remaining

20   allegations in Paragraph 80 of the Complaint, and on that basis, denies those allegations.

21         81.    CrossCountry is without knowledge or information sufficient to form a belief as to the

22   allegations in Paragraph 81 of the Complaint, and on that basis, denies those allegations.

23         82.    CrossCountry is without knowledge or information sufficient to form a belief as to the

24   allegations in Paragraph 82 of the Complaint, and on that basis, denies those allegations.

25         83.    CrossCountry admits and avers that it received a letter dated March 10, 2017, from

26   Freedom Mortgage, which enclosed a copy of a letter, dated March 2, 2017, that Freedom Mortgage

27   purportedly had sent to Mr. Kami.  CrossCountry refers to those letters for complete statements of

28   their contents.  CrossCountry is without knowledge or information sufficient to form a belief as to the



8

1   remaining allegations in Paragraph 83 of the Complaint, and on that basis, denies those allegations.

2   84.   CrossCountry admits and avers that it received a letter dated March 10, 2017, from

3   Freedom Mortgage, which enclosed a copy of a letter, dated March 2, 2017, that Freedom Mortgage

4   purportedly had sent to Mr. Kami.

5   85.   CrossCountry admits and avers that it did not respond to the letter, dated March 10,

6   2017, that it received from Freedom Mortgage.  CrossCountry avers that Freedom Mortgage's

7   March 10, 2017, letter did not request any response.  CrossCountry further avers that it understood

8   that Mr. Kami's lawyer responded to Freedom Mortgage's March 2, 2017, letter.  To the extent

9   Paragraph 85 alleges that CrossCountry never responded to Freedom Mortgage's assertions regarding

10  Mr. Kami, CrossCountry denies any such allegation and refers Freedom Mortgage to CrossCountry's

11  letter dated July 14, 2017.

12  86.   CrossCountry denies the allegation in Paragraph 85 of the Complaint that any alleged

13  conduct by Mr. Kami "and others" was "on CrossCountry's behalf."  CrossCountry is without

14  knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 86

15  of the Complaint, and on that basis, denies those allegations.

16  87.   CrossCountry denies the allegations in Paragraph 87 of the Complaint.

17  88.   CrossCountry incorporates by reference its responses to Paragraphs 1 through 87 of

18  the Complaint as if fully set forth herein.

19  89.   Paragraph 89 of the Complaint states a legal conclusion to which a response is not

20  required.  To the extent a response is required, CrossCountry denies the allegations in Paragraph 89

21  of the Complaint.

22  90.   CrossCountry denies the allegations in Paragraph 90 of the Complaint.

23  91.   CrossCountry denies the allegations in Paragraph 91 of the Complaint.

24  92.   CrossCountry denies the allegations in Paragraph 92 of the Complaint.

25  93.   CrossCountry denies the allegations in Paragraph 93 of the Complaint.

26  94.   CrossCountry denies the allegations in Paragraph 94 of the Complaint.



27  95.   CrossCountry denies the allegations in Paragraph 95 of the Complaint.

28  96.   CrossCountry incorporates by reference its responses to Paragraphs 1 through 95 of

the Complaint as if fully set forth herein.

97.     CrossCountry denies the allegations in Paragraph 97 of the Complaint.

98.     CrossCountry denies the allegations in Paragraph 98 of the Complaint.

99.     CrossCountry denies the allegations in Paragraph 99 of the Complaint.

100.    CrossCountry incorporates by reference its responses to Paragraphs 1 through 99 of the Complaint as if fully set forth herein.

101.    Paragraph 101 of the Complaint states a legal conclusion to which a response is not required.  To the extent a response is required, CrossCountry denies the allegations in Paragraph 101 of the Complaint.

102.    CrossCountry denies the allegations in Paragraph 102 of the Complaint.

103.    CrossCountry denies the allegations in Paragraph 103 of the Complaint.

104.    CrossCountry denies the allegations in Paragraph 104 of the Complaint.

105.    CrossCountry incorporates by reference its responses to Paragraphs 1 through 104 of the Complaint as if fully set forth herein.

106.    Paragraph 106 of the Complaint states a legal conclusion to which a response is not required.  To the extent a response is required, CrossCountry denies the allegations in Paragraph 106 of the Complaint.

107.    CrossCountry denies the allegations in Paragraph 107 of the Complaint.

108.    CrossCountry denies the allegations in Paragraph 108 of the Complaint.

109.    CrossCountry denies the allegations in Paragraph 109 of the Complaint.

110.    CrossCountry denies the "Prayer for Relief" paragraph, including all subparagraphs thereto.  CrossCountry denies that Freedom Mortgage is entitled to any of the relief requested in the "Prayer for Relief" or to any other relief whatsoever.

111.    Unless expressly admitted herein, CrossCountry generally and specifically denies each and every allegation contained in each and every paragraph of the Complaint and each and every cause of action thereof.  CrossCountry further denies that it is responsible for any damages, or any percentage of damages, claimed by Freedom Mortgage in the Complaint.



**AFFIRMATIVE DEFENSES**

1.      The Complaint, and each and every claim stated therein, fails to state a claim upon which relief can be granted.

2.      Freedom Mortgage's claims are barred, in whole or in part, by laches, equitable estoppel, waiver, or other related equitable doctrines.

3.      Freedom Mortgage's claims are barred, in whole or in part, by the doctrine of unclean hands.

4.      To the extent Freedom Mortgage's claims are based on alleged contracts between it and its former employees, Freedom Mortgage's claims are barred, in whole or in part, because Freedom Mortgage breached its contracts.

5.      To the extent Freedom Mortgage's claims are based on alleged contracts between it and its former employees, Freedom mortgage's claims are barred, in whole or in part, because the contracts are invalid and unenforceable, in whole or in part.

6.      To the extent Freedom Mortgage's claim under the federal Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §§ 1030 *et seq.*, is premised on allegations that then-Freedom Mortgage employees accessed  Freedom Mortgage's computers or computer network "without authorization," or "exceed[ed] authorized access," such claim fails because the then-Freedom employees had permission to access Freedom Mortgage's computers or computer network.  *See United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012) (en banc).

7.      Freedom Mortgage's claims are barred because CrossCountry at all times lacked the requisite knowledge and/or intent to sustain those claims.

8.      Freedom Mortgage's claims are barred, in whole or in part, by its failure to mitigate damages.

9.      Any injury that Freedom Mortgage allegedly may have suffered is a result of Freedom Mortgage's actions and/or independent actions taken by third parties, and therefore CrossCountry is not responsible.

10.      Freedom Mortgage's tortious-interference claims are barred, in whole or in part, because of CrossCountry's privilege or justification as a competitor.



11.     Freedom Mortgage's claims for punitive damages are barred on the grounds that CrossCountry's actions were not fraudulent, malicious, oppressive, wanton, or reckless, and CrossCountry acted in good faith.

12.     CrossCountry reserves the right to request a more definite statement.  CrossCountry further reserves the right to raise any additional defenses, counterclaims, cross-claims, and third-party claims not asserted herein of which it becomes aware through discovery or other investigation and will amend or modify its Answer accordingly.

WHEREFORE, having fully answered the Complaint, CrossCountry denies that it is liable for any of the claims in the Complaint, requests that the Court grant Freedom Mortgage no relief by way of the Complaint, and further requests that the Court dismiss the Complaint with prejudice and award CrossCountry its costs and fees.

## COUNTERCLAIM

CrossCountry, by its undersigned attorneys, alleges for its Counterclaim against Freedom Mortgage, upon knowledge as to itself and its conduct and upon information and belief as to all matters, as follows:

### Nature of the Action

1.     CrossCountry hereby alleges and reaffirms the statements in Paragraphs 1 through 111 of its Answer as if fully rewritten here.

2.     In this Counterclaim, CrossCountry seeks compensatory damages, punitive damages, costs, and attorneys' fees for Freedom Mortgage's unfair competition based on legal action, in connection with Freedom Mortgage's tortious, unlawful, bad-faith, and anti-competitive conduct in threatening and filing the instant litigation against CrossCountry (the "Kami Litigation").

3.     The Kami Litigation was conceived and implemented as a scheme by Freedom Mortgage, targeted against CrossCountry in Ohio, to extract from CrossCountry a below-market business deal for the sale of mortgage loans and to intimidate CrossCountry into refraining from lawfully hiring any former Freedom-Mortgage employees nationwide, all with the intent to injure CrossCountry's ability to compete in the same retail mortgage market as Freedom Mortgage, and in retaliation for what Freedom Mortgage perceives as the "poaching" of its employees.

4.      The Kami Litigation is objectively baseless.  All of the former employees of Freedom Mortgage who CrossCountry hired in Las Vegas in the spring of 2017 were hired lawfully.  Those individuals were no longer satisfied working at Freedom Mortgage, and reached out to CrossCountry to explore whether CrossCountry might be willing to hire them as a group.  CrossCountry never solicited, encouraged, assisted, or induced any of those individuals to any breach employment agreement with Freedom Mortgage, to solicit any of Freedom Mortgage's customers or other employees, to use or disclose any of Freedom Mortgage's confidential business information, or to give CrossCountry access to any of Freedom Mortgage's computer systems.

5.      What is more, Freedom Mortgage realized that it lacked any objective basis to threaten or file the Kami Litigation.  By letter dated March 10, 2017, Freedom Mortgage sent to CrossCountry a copy of a letter that Freedom Mortgage had sent to Mr. Kami, a former Freedom employee in Las Vegas who CrossCountry had recently hired.  The March 10 letter did not—and would have had no basis to—assert that CrossCountry knew of, or was involved in, any improper conduct by Mr. Kami or any other former employee in Las Vegas.  It was not until months later that Freedom Mortgage hatched a plan to exploit Mr. Kami's hiring for its own business ends, in order to harm CrossCountry's ability to compete.

6.      In or about May or June 2017, Freedom Mortgage targeted CrossCountry, a much smaller retail mortgage lender based in Ohio, as a vehicle for obtaining mortgage loans at below-market prices. As a small but growing mortgage-loan originator based in Ohio, part of CrossCountry's business is to sell originated loans on the secondary market.  When CrossCountry does so, its practice has always been to sell those loans to the highest bidder.  Indeed, CrossCountry's ability to compete with much larger mortgage lenders like Freedom Mortgage depends in part on its ability to obtain market-based pricing for the loans it sells (not to mention the ability to grow its branch network and hire qualified loan officers).  On occasion, CrossCountry had sold loans to Freedom Mortgage.  But by May or June, Freedom Mortgage decided it wanted to increase its loan purchases from CrossCountry at a bargain.  It instructed its lawyers to draft a complaint against CrossCountry in connection with CrossCountry's hiring of Mr. Kami and other former Freedom Mortgage employees in Las Vegas in early 2017.  Freedom Mortgage executives then reached out to CrossCountry's



executives in Ohio in late June 2017 to begin a "negotiation" for the purchase of an increased number of loans from CrossCountry.  During that negotiation, Freedom Mortgage raised for the first time that it had a complaint in hand regarding the Las Vegas hirings, and that it could make that complaint go away if CrossCountry would agree to sell them loans on terms favorable to Freedom Mortgage.

7.      Over the next several months, the Freedom Mortgage executives attempted to strong arm CrossCountry into a favorable business deal, first involving the sale of loans to Freedom Mortgage at below-market prices and, later, evolving into an effort to get CrossCountry to enter into a co-issuance agreement with it, whereby CrossCountry would originate mortgages for Freedom Mortgage to buy at below-market prices.  At no time did those executives involve Freedom Mortgage's lawyers in any discussions with CrossCountry, nor did they ever attempt to discuss the substance of their alleged claims regarding Mr. Kami, nor did they ever discuss any potential settlement of those claims.  Instead, the modus operandi of those Freedom Mortgage executives was to use the draft complaint as a cudgel to get CrossCountry to agree to an uncompetitive deal, at CrossCountry's expense.  The Freedom Mortgage executives appreciated the wrongfulness of their conduct, repeatedly referring to the draft complaint in coded language, such as "the other thing" or "the situation," which they could make go away if only CrossCountry would agree to their terms.  And the Freedom Mortgage executives knew all the while that succeeding in their scheme would mean hurting CrossCountry's business and ability to compete.  That was their goal.

8.      This was not a novel tactic that Freedom Mortgage conceived of specifically to use with CrossCountry.  Rather, Freedom Mortgage uses this method—conjuring draft complaints and baseless threatened lawsuits—in business negotiations to harm its smaller competitors in the retail mortgage market.  Indeed, the Freedom Mortgage executives admitted during their "negotiations" with CrossCountry in the summer of 2017 that, when smaller retail mortgage lenders hire former Freedom Mortgage employees, Freedom Mortgage often uses those circumstances to get the competitor to agree to a favorable business deal regarding the sale of mortgages.

9.      Notwithstanding Freedom Mortgage's unlawful tactics, in the fall of 2017, CrossCountry declined to do a business deal on Freedom Mortgage's terms.  Having been spurned, Freedom Mortgage decided to file the Kami Litigation in any event.  By then, CrossCountry had hired



other former Freedom Mortgage loan officers in other parts of the country, such as Melville, New York.  Freedom Mortgage saw the filing of the Kami Litigation as, among other things, a way to suppress competition by CrossCountry, by chilling any desire by CrossCountry to hire any former Freedom-Mortgage employees going forward.

10.    Freedom Mortgage filed its draft complaint against CrossCountry on November 10, 2017, in the United States District Court for the District of New Jersey—even though it must have known that there could be no personal jurisdiction over CrossCountry in such a forum.  CrossCountry is neither incorporated nor maintains a principal place of business in New Jersey, and therefore general personal jurisdiction was not available.  Specific personal jurisdiction was likewise unavailable because none of the events that gave rise to the Kami Litigation have any connection to New Jersey. The branches at issue are in Nevada; the employees and customers at issue are in Nevada; the email, computers, and computer systems at issue are in Nevada; all of the conduct at issue occurred in Nevada; and the alleged purpose of that conduct—for CrossCountry to acquire a new branch—was directed at Nevada.  CrossCountry thus moved to dismiss that action for lack of personal jurisdiction. Not surprisingly, instead of defending its spurious decision to sue CrossCountry in New Jersey, Freedom Mortgage voluntarily dismissed the action and immediately re-filed its baseless suit in this Court.  Its motives in doing so are tortious and malicious.  Its goal is to harm a competitor, not only by forcing CrossCountry to bear substantial and unnecessary legal expenses, but by causing CrossCountry to rue the day it was willing to hire any former Freedom Mortgage employee, and wrongfully intimidating CrossCountry into not hiring any former Freedom Mortgage employees in the future.

11.    All of this amounts to unfair competition through legal action.  *See, e.g., Am. Chem. Soc. v. Leadscope, Inc.*, 978 N.E.2d 832, Syl. ¶ 1, 839-52 (Ohio 2012).  Because of Freedom Mortgage's tortious conduct, CrossCountry has suffered and continues to suffer damages, including the cost of defending baseless and malicious litigation by Freedom Mortgage.

## Parties

12.    Defendant and Counterclaim-Plaintiff CrossCountry is an Ohio corporation headquartered in Brecksville, Ohio.  Founded in 2003, CrossCountry is a growing retail mortgage



lender licensed in all 50 states that offers customers a range of mortgage services and products in home purchase, refinance, and home equity.   CrossCountry competes directly with Freedom Mortgage.

13.     Plaintiff and Counterclaim-Defendant Freedom Mortgage is a New Jersey corporation headquartered in Mount Laurel, New Jersey.  It is one of the largest mortgage lenders in the United States, operating in all 50 states.

**Jurisdiction and Venue**

14.     This Court has subject-matter jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15.     This court also has jurisdiction over this Counterclaim through supplemental jurisdiction pursuant to 28 U.S.C. § 1367, because the claims asserted herein are so related to the claims set forth in the Complaint that they form part of the same case or controversy under Article III of the United States Constitution.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391.

**Background**

**A.     The Previous Business Relationship Between CrossCountry and Freedom Mortgage**

17.     As part of its business, CrossCountry sells loans or groups of loans it has originated to third parties on the secondary mortgage market.  Purchasers are typically banks or other mortgage companies that may, for example, keep the loans and service them, resell them, and/or pool them together in order to create and issue mortgage-backed securities.

18.     Freedom Mortgage had been a buyer of such loans from CrossCountry since as early as 2016.  By mid-2017, however, CrossCountry had been selling fewer mortgages to Freedom Mortgage because Freedom Mortgage's purchase offers had become less competitive.  Freedom Mortgage executives, including Robert Porges (Senior Vice President and National Sales Manager– East, of Freedom Mortgage's Correspondent Lending division) and David Sheeler (Executive Vice President of Freedom Mortgage's Correspondent Lending division), began looking for a way to get CrossCountry to sell Freedom Mortgage more loans at the prices they wanted.



16

**B.     CrossCountry's Hiring of Certain Former Freedom Mortgage Employees in Las Vegas**

19.     Many months earlier, Mr. Kami and Ms. Singleton, then-employees of Freedom Mortgage in Las Vegas, Nevada, approached CrossCountry about leaving Freedom Mortgage to work for CrossCountry.  CrossCountry did not initiate communications with Mr. Kami or Ms. Singleton or any other Freedom Mortgage employee in Las Vegas about potentially joining CrossCountry.

20.     At the time, CrossCountry was informed that a group of Freedom Mortgage employees were dissatisfied with Freedom Mortgage as an employer and had decided to leave Freedom Mortgage collectively.

21.     CrossCountry eventually hired Mr. Kami, Ms. Singleton, and a number of other former Freedom Mortgage employees in Las Vegas.  In the process of doing so, CrossCountry did not ask, direct, induce, encourage, or assist Mr. Kami, Ms. Singleton, or any other former Freedom Mortgage employee to solicit or recruit other Freedom Mortgage employees to leave Freedom Mortgage in favor of CrossCountry.  Rather, CrossCountry was merely informed which individuals were interested in working for CrossCountry, considered them as candidates, and made offers of employment consistent its ordinary hiring practices.

22.     Likewise, CrossCountry did not ask, direct, induce, encourage, or assist Mr. Kami, Ms. Singleton, or any other former Freedom Mortgage employee to disclose, use, or otherwise share any of Freedom Mortgage's confidential business information or trade secrets.  And CrossCountry did not receive any confidential business information or trade secrets belonging to Freedom Mortgage.  CrossCountry does not have, and has never had, any desire to access any of Freedom Mortgage's confidential business information or trade secrets.

23.     Similarly, CrossCountry did not solicit, persuade, or induce any Freedom Mortgage customer to switch from Freedom Mortgage to CrossCountry in connection with its hiring of Mr. Kami, Ms. Singleton, or any other other former Freedom Mortgage employee in Las Vegas.  Nor did CrossCountry ask, direct, induce, encourage, or assist Mr. Kami, Ms. Singleton, or any other former Freedom Mortgage employee to solicit, persuade, or induce any customer of Freedom Mortgage.

24.     Upon information and belief, Freedom Mortgage's former employees who joined CrossCountry informed any customers with whom they were discussing a mortgage loan that they



were leaving Freedom Mortgage to join CrossCountry.  While it is possible that certain mortgage applicants chose to follow their loan officers and complete their mortgage loans with CrossCountry, it nonetheless remained the case that CrossCountry had no desire to, and made no effort to, induce the solicitation of any Freedom Mortgage customers or in any way interfere with Freedom Mortgage's customer relationships.

25.     Additionally, in the process of hiring Mr. Kami, Mr. Singleton, and other former Freedom Mortgage employees, CrossCountry did not ask, direct, encourage, or assist them to access or use Freedom Mortgage's computers or computer networks on behalf of CrossCountry, nor did CrossCountry personnel ever directly or indirectly access Freedom Mortgage's computers or computer networks.  Indeed, CrossCountry does not have, and has never had, any interest in accessing any of Freedom Mortgage's computers or networks.

26.     Nor is there any objective basis for Freedom Mortgage to allege that CrossCountry ever accessed Freedom Mortgage's computers or computer network.  On or about March 24, 2017, CrossCountry entered into a sublease with Jia Mei Wang for a space at the 6256 Spring Mountain Road office complex.  Ms. Wang, a former Freedom Mortgage employee, had leased that space personally, in her own name.  A short time after entering into the sublease, CrossCountry personnel went to the premises and created a wireless network there, as is typical when opening any new branch.  CrossCountry did not use any of Freedom Mortgage's computer equipment in setting up this wireless network.  Nor did CrossCountry ever access, interfere with, or disable any of Freedom Mortgage's computer equipment or computer networks.  Freedom Mortgage's allegations otherwise are fabricated and baseless.

27.     CrossCountry did not conduct business at the 6256 Spring Mountain Road location until after it executed the sublease with Ms. Wang, and CrossCountry never conducted any business from a Freedom Mortgage facility.

## C.     Freedom Mortgage's March 2017 Letters Regarding Mr. Kami

28.     On or about March 11, 2017, CrossCountry received a letter dated March 10, 2017 from Keith Joseph, Corporate Counsel of Freedom Mortgage, regarding Mr. Kami (the "March 10 Letter").  The letter asserted, without any detail, that Mr. Kami was engaged in "tortious conduct by



reaching out to current Freedom Mortgage employees and customers." The letter did not allege that CrossCountry had committed any tortious conduct, and instead asked CrossCountry to "instruct Mr. Kami to cease all such conduct so that your company is not complicit in this unlawful activity." A copy of the March 10 Letter is attached as Exhibit A.

29.     Freedom Mortgage's March 10 Letter attached a copy of a letter dated March 2, 2017, that it had purportedly sent to Mr. Kami (the "March 2 Letter"). This letter asked Mr. Kami, again without any detail, to "refrain from soliciting current employees or customers of Freedom Mortgage to leave and join your new company." A copy of the March 2 Letter is attached as Exhibit B.

30.     CrossCountry inquired with Mr. Kami about the March 2 Letter, and was given no reason to believe that Mr. Kami or anyone else it had hired in Las Vegas had breached or was breaching any duty to Freedom Mortgage. To this day, CrossCountry has no reason to believe that any such conduct has occurred. CrossCountry did not receive any other communication from Freedom Mortgage regarding Mr. Kami or the Las Vegas hirings for over three months following the March 10 Letter, and believed the matter to be closed.

**D.     Freedom Mortgage Devises a Scheme to Harm CrossCountry**

31.     By May or June 2017, Freedom Mortgage had no objective basis for pursuing any claims against CrossCountry regarding the Las Vegas hirings. But Freedom Mortgage did see an opportunity to use the Las Vegas hirings to obtain an unfair business advantage and to harm CrossCountry. Freedom Mortgage therefore instructed its lawyers to prepare a draft complaint for the Kami Litigation.

32.     On or about June 19, 2017, Mr. Porges, the Senior Vice President and National Sales Manager–East of Freedom Mortgage's Correspondent Lending division, reached out to CrossCountry's Chief Credit Officer, Brett Schiffer, to schedule a conference call for June 20, 2017. Mr. Schiffer works in CrossCountry's headquarters in Brecksville, Ohio.

33.     Among other things, Freedom Mortgage's Correspondent Lending division invests in and purchases closed whole loans and servicing rights. It also partners with other mortgage lenders in co-issuance arrangements whereby, for example, the other lender originates mortgage loans while



1   Freedom Mortgage purchases them.

2   34.   CrossCountry believed that the purpose of the June 20 call was to discuss the declining

3   number of loan sales CrossCountry was making to Freedom Mortgage in the secondary mortgage

4   market, ways for CrossCountry to sell more loans to Freedom Mortgage, and/or efforts to expand the

5   business relationship between the two companies.

6   35.   The June 20 call occurred as scheduled.  Messrs. Schiffer and Porges attended, along

7   with David Sheeler, the Executive Vice President for Freedom Mortgage's Correspondent Lending

8   division.  As expected, Messrs. Porges and Sheeler indicated during the call that Freedom Mortgage

9   wanted CrossCountry to sell Freedom Mortgage more loans.   Mr. Schiffer expressed that

10  CrossCountry would sell Freedom Mortgage more loans as long as Freedom Mortgage offered the

11  best prices.  Then, unexpectedly, Messrs. Porges and Sheeler referenced for the first time a draft legal

12  complaint against CrossCountry regarding Mr. Kami and other former Freedom Mortgage employees

13  that CrossCountry had hired in Las Vegas.  They said that, if CrossCountry would sell enough loans

14  to Freedom Mortgage, then Freedom Mortgage would not file the lawsuit.  Mr. Schiffer informed

15  Messrs. Porges and Sheeler that he was unaware of any complaint and that CrossCountry would have

16  to review it.

17  36.   Up until that time, CrossCountry had not been informed of any such complaint.  And

18  it was highly unusual that Freedom Mortgage's Correspondent Lending executives, not its legal

19  department or outside counsel, would notify CrossCountry of such a complaint.

20  37.   On June 22, 2017, Eric Julian, an Account Executive in Freedom Mortgage's

21  Correspondent Lending division, sent an email to Kevin Alexander, CrossCountry's Vice President

22  of Secondary Marketing, to offer so-called "improved pricing" for CrossCountry's next allocation of

23  loans.  Mr. Alexander works in CrossCountry's headquarters in Brecksville, Ohio.

24  38.   The next day, June 23, 2017, Mr. Sheeler of Freedom Mortgage e-mailed

25  CrossCountry the draft complaint he had referenced during the June 20 call.  The complaint was

26  substantially similar to the one that Freedom Mortgage later filed in this action.

27  39.   On or about June 26, 2017, Mr. Julian called Mr. Alexander to discuss Freedom

28  Mortgage's proposed pricing.  Mr. Julian was eager for CrossCountry to sell Freedom Mortgage loans,



while Mr. Alexander indicated that CrossCountry was still reviewing Freedom Mortgage's proposed pricing.

40.     Then, on June 27, 2017, Mr. Porges at Freedom Mortgage e-mailed Mr. Schiffer at CrossCountry to schedule a follow-up call.  Mr. Schiffer offered to have a call the next day, but informed Mr. Porges that CrossCountry had reviewed Freedom Mortgage's proposed pricing and found it far "off"—by approximately 100 basis points or more—compared to that of other competitors for the purchase of CrossCountry's loans.

41.     The following day, June 28, Messrs. Porges and Sheeler of Freedom Mortgage held a call with Mr. Schiffer, along with CrossCountry's CEO Ron Leonhardt.  During the call, Messrs. Porges and Sheeler continued to aggressively pursue a purchase of loans from CrossCountry.  But Messrs. Leonhardt and Schiffer responded that Freedom Mortgage's pricing was not competitive.  Mr. Leonhardt stated in no uncertain terms that CrossCountry sells its loans to whoever offers the best prices.  At that point, Messrs. Porges and Sheeler again raised the draft complaint, referring to it in code as "the other thing" or "the situation."  They suggested that if CrossCountry would agree to sell loans to Freedom Mortgage, notwithstanding the uncompetitive pricing, Freedom Mortgage could make the draft complaint go away.  Messrs. Leonhardt and Schiffer responded that regardless of any complaint, CrossCountry would continue to sell its loans to the highest bidders, but they offered to review the complaint and respond to it.

42.     CrossCountry and Freedom Mortgage continued to communicate while CrossCountry reviewed the complaint.  On July 7, 2017, Mr. Porges requested a call with Mr. Schiffer for an update.  While Mr. Porges continued to push for a loan sale by CrossCountry to make "the other thing" go away, Mr. Schiffer continued to insist on competitive pricing.

43.     On July 10, 2017, Mr. Julian of Freedom Mortgage called Mr. Alexander of CrossCountry to continue discussing the potential sale of loans.  Freedom Mortgage had requested a "bid tape" from CrossCountry.  A bid tape is a document that generally lists a mortgage company's closed loans over a given period to provide a sample of the company's business.  Bid tapes are commonly exchanged between companies in the mortgage industry doing business.  Later on July 10, Mr. Julian e-mailed Mr. Alexander to confirm receiving the bid tape.  Mr. Julian also attempted to



21

schedule a lunch or dinner meeting with CrossCountry in Cleveland, Ohio—presumably to continue pushing for the loan sale.

**E.     CrossCountry Responds to the Complaint, But Freedom Mortgage Continues to Insist on Uncompetitive Pricing**

44.     On July 14, 2017, Mr. Leonhardt sent a letter to Mr. Porges responding to Freedom Mortgage's draft complaint.  In it, CrossCountry explained that Freedom Mortgage's allegations were without merit.  But, in light of their existing business relationship, CrossCountry offered to discuss an amicable resolution, including by reviewing CrossCountry's loan pipeline in Las Vegas to see if it contained any mortgage loans that had previously been in process at Freedom Mortgage.  Freedom Mortgage, however, never responded to that letter, and never attempted to engage in any discussion about the merits of its purported claims in the Kami Litigation.  It did not involve lawyers.  It did not involve its own retail mortgage team, which would have overseen its former Las Vegas branch.  Rather, the discussions involved only Freedom Mortgage's Correspondent Lending personnel, who used the draft complaint as a blunt instrument to get CrossCountry to sell Freedom Mortgage more loans, regardless of the pricing.  Indeed, for Freedom Mortgage, the merit of the Kami Litigation was beside the point, because it had none and Freedom Mortgage knew that.  Rather, the value of the Kami Litigation from Freedom Mortgage's perspective was that it threatened CrossCountry with costly and unnecessary litigation, in order to give Freedom Mortgage's correspondent side of its business a cudgel to extract the uncompetitive business deal it wanted from CrossCountry.

45.     For Freedom Mortgage, this tactic is pattern and practice.  During their effort to extract an uncompetitive transaction from CrossCountry, Freedom Mortgage's executives specifically told Mr. Leonhardt that Freedom Mortgage has used the same tactic in other instances where smaller retail mortgage lenders like CrossCountry had hired former Freedom Mortgage employees.  In order to unfairly compete against those smaller lenders, Freedom Mortgage's practice was to threaten and/or file baseless litigation to compel them to submit to unfair business arrangements with Freedom Mortgage or to abstain from lawfully hiring former Freedom Mortgage employees.

46.     Freedom Mortgage knew full well that its practice was unfair, uncompetitive, and wrong.  Hence, its use of obvious coded language.  For example, on July 18, 2017, Mr. Porges of



Freedom Mortgage e-mailed Mr. Schiffer of CrossCountry, asking for an update on "our situation"—again referring to Freedom Mortgage's draft complaint—and pressing to "move forward and beyond this."  A copy of Mr. Porges e-mail is attached as Exhibit C.

47.     Baseless claims; subjective intent to harm the ability of a smaller lender to compete; consciousness of guilt.  It was all there.

**F.     Freedom Mortgage's Transition To Demanding a One-Sided Co-Issuance Agreement**

48.     By the fall of 2017, as the volume of loans sold to Freedom Mortgage remained low and as CrossCountry refused to budge on pricing for the sale of loans, Freedom Mortgage began to push a different type of business arrangement on CrossCountry:  a co-issuance agreement.  Under such an arrangement, Freedom Mortgage was proposing that the companies establish terms under which CrossCountry would originate loans and then sell them to Freedom Mortgage directly, rather than selling them openly on the secondary mortgage market.  Again, Freedom Mortgage was seeking to use the Kami Litigation to advantage itself at CrossCountry's expense by obtaining a below-market deal.

49.     On September 22, 2017, Freedom Mortgage emailed to CrossCountry a term sheet for a co-issuance agreement based on bid-tape information that had been provided by CrossCountry.  Over the next several weeks, Freedom Mortgage executives, including Mr. Julian, continued to push for a co-issuance agreement, and Kevin Alexander of CrossCountry (who was leading CrossCountry's analysis of Freedom Mortgage's proposed pricing) repeatedly responded that Freedom Mortgage's pricing was below market and not competitive.  Indeed, CrossCountry had also been discussing a co-issuance arrangement with two other companies at that time, and both were proposing far better pricing than Freedom Mortgage.

50.     In response to CrossCountry's resistance, Freedom Mortgage attempted to turn up the heat.  On October 9, 2017, Mr. Porges of Freedom Mortgage sent an email to Messrs. Leonhardt and Schiffer at CrossCountry.  Mr. Porges wrote that he and Mr. Sheeler (Freedom Mortgage's Executive Vice President) "believe it is time to move forward and get a deal completed" (referring to a co-issuance agreement) "and address the ongoing issue that we have been speaking about" (referring, again in code, to the draft complaint regarding Mr. Kami).  Mr. Porges further noted that he and Mr.



Julian were scheduled to have a call on October 11 with Mr. Alexander of CrossCountry to discuss the co-issuance agreement, and wanted to make sure Mr. Alexander was "in the loop around what we are trying to accomplish overall."  In other words, Mr. Porges was trying to impress on CrossCountry that Mr. Alexander should be considering the threatened Kami Litigation when analyzing Freedom Mortgage's below-market pricing.  Mr. Leonhardt responded that same day, informing Mr. Porges that CrossCountry's only concern was pricing:  "[W]e run pure best ex[ecution].  If pricing doesn't win this is a waste of time.  We're exploring 2 other co-issues, just need you guys to push your best pricing our way.  Right now pricing isn't there."  A copy of the October 9 e-mail exchange is attached hereto as Exhibit D.

51.    Notwithstanding further efforts by Freedom Mortgage's executives to strong-arm CrossCountry into a below-market deal using the threatened Kami Litigation, it soon became clear that CrossCountry would not roll over.  On October 23, 2017, Messrs. Schiffer and Alexander of CrossCountry met in person with Mr. Porges and informed him that CrossCountry could not move forward with a co-issuance deal based on the uncompetitive pricing that Freedom Mortgage was offering.  When Mr. Porges again raised the threatened Kami Litigation, Mr. Schiffer told him that CrossCountry was finished listening to Freedom Mortgage's threats.

**G.    Freedom Mortgage Files the Baseless Kami Litigation**

52.    Having been spurned by CrossCountry, Freedom Mortgage filed its draft complaint on November 10, 2017 in the United States District Court for the District of the New Jersey.  By then, Freedom Mortgage had calculated that, even though the threat of litigation was insufficient to extract an uncompetitive business deal from CrossCountry, actually filing the Kami Litigation would nonetheless injure CrossCountry in forcing it to incur substantial litigation expense and in stifling any desire by CrossCountry to hire former Freedom Mortgage employees in the future.  Again, the merit of the Kami Litigation was superfluous.  It was based on nothing more than fabricated allegations and speculation, at best.  But that took a back seat to Freedom Mortgage's desire to cause competitive harm to CrossCountry.

53.    The filed version of Freedom Mortgage's complaint was substantially identical to the draft complaint.  And it was still objectively baseless.  What is more, Freedom Mortgage's attempt to



assert personal jurisdiction over CrossCountry in New Jersey was also objectively baseless.  As noted above, as soon as CrossCountry moved to dismiss for lack of personal jurisdiction, Freedom Mortgage promptly abandoned the New Jersey action and refiled the instant action in this Court.

54.     Again, to Freedom Mortgage, the substance of its claims is irrelevant, because there is no substance.   The point is to inflict pain on its smaller competitor, to harm CrossCountry's competitive position, and to try to teach CrossCountry a lesson that it should not try to compete in Freedom Mortgage's markets.

### Count One
(Unfair Competition Based Upon Legal Action)

55.     CrossCountry hereby realleges and reaffirms the allegations in Paragraphs 1 through 54 of its Counterclaim as if fully rewritten herein.

56.     Freedom Mortgage's claims in this case, including the predecessor action in the United States District Court for the District of New Jersey, are objectively baseless.  As set forth above, the claims against CrossCountry have no merit, and Freedom Mortgage does not have—and never had—any objective basis for its claims in the Kami Litigation.

57.     In addition, Freedom Mortgage lacked any objective basis to file its action in the United States District Court for the District of New Jersey, insofar as a New Jersey court patently lacks personal jurisdiction over CrossCountry in this matter.

58.     In threatening and filing the Kami Litigation, Freedom Mortgage subjectively intended to injure CrossCountry's ability to be competitive.  As alleged above, the Kami Litigation was conceived and implemented by Freedom Mortgage as a tool to coerce CrossCountry into an uncompetitive, below market business deal with Freedom Mortgage, to force CrossCountry into incurring substantial and unnecessary litigation expenses, and to intimidate CrossCountry into refraining from lawfully hiring former Freedom Mortgage employees in the future, all in order to cause competitive harm to CrossCountry.

59.     As a result of Freedom Mortgage's tortious and anti-competitive conduct, CrossCountry has suffered and will suffer substantial damages including, but not limited to, the fees and costs necessary to defend against Freedom Mortgage's baseless Kami Litigation in this Court and

in the United States District Court for the District of New Jersey.

**<u>Prayer for Relief</u>**

WHEREFORE, CrossCountry prays for relief as follows:

1.      A judgment dismissing the Complaint in its entirety with prejudice;

2.      An award of damages, in an amount to be determined at trial, to compensate for the injury incurred as a result of Freedom Mortgage's tortious and unlawful unfair competition through legal action;

3.      An award of costs, expenses, and attorneys' fees incurred in both this Court and in the United States District Court for the District of New Jersey;

4.      An award of punitive damages against Freedom Mortgage; and

5.      An order granting CrossCountry such further relief as the Court deems just and proper.

**<u>Jury Demand</u>**

CrossCountry demands trial by jury on both Freedom Mortgage's claims and CrossCountry's Counterclaim.

Dated:  June 1, 2018                                   Respectfully Submitted


*/s/  Hector J. Carbajal II*
HECTOR J. CARBAJAL II (SBN 6247)
2340 Paseo Del Prado STE D203
Las Vegas, Nevada 89102

Michael A. Platt*
Benjamin M. Gavel*
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
maplatt@jonesday.com
bgavel@jonesday.com

*Attorneys for Defendant*
*CrossCountry Mortgage, Inc.*

* *Pro hac vice* application forthcoming



1

## **CERTIFICATE OF MAILING**

2        I HEREBY CERTIFY that pursuant to Fed. R. Civ. P. 5 on June 1, 2018, I caused service of

3   the foregoing **ANSWER AND COUNTERCLAIM OF DEFENDANT** by mailing a copy by United

4   States Postal Service, postage prepaid, via email, and/or via electronic mail through the United States

5   District Court's CM/ECF system to all CM/ECF registrants for this matter.

6                                                  */s/ Hector J. Carbajal II*
                                                   An Employee of SMITH CARBAJAL
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

